**SEAFORD GOLF AND COUNTRY CLUB, a Delaware corporation, Plaintiff Below, Appellant,**

v.

**E.I. duPONT de NEMOURS AND COMPANY, a Delaware corporation, Defendant Below, Appellee.**

No. 530, 2006.

Supreme Court of Delaware.

Submitted: Feb. 14, 2007.
Decided: May 15, 2007.

David R. Hackett of Griffin & Hackett, P.A. Georgetown, DE, for Appellant.

Arthur L. Dent (argued) and Sarah E. DiLuzio of Potter Anderson & Corroon, LLP, Wilmington, DE, for Appellee.

Before HOLLAND, BERGER and JACOBS, Justices.

JACOBS, Justice:

Seaford Golf and Country Club ("the Club") appeals from an order of the Superior Court granting summary judgment to the appellee, E.I. duPont de Nemours and Company ("duPont"), and denying the Club's cross motion for summary judg-

ment. The dispute concerns whether certain property that the Club purchased and leased from duPont remains subject to a deed restriction and a right of first refusal running in duPont's favor. Those restrictions are contained in three instruments (collectively, "the Documents"): a deed, a ground lease and a memorandum of lease agreement. The Club's property remained subject to the deed restriction and right of first refusal so long as duPont continued to own, and until duPont divested, its interest in its "Seaford, Delaware Plant." The Seaford Plant was a duPont nylon manufacturing facility that duPont sold—except for the underlying land—in 2003.

The Club now wishes to sell certain of its property free and clear of the deed restriction and the right of first refusal. duPont claims that those restrictions remain valid and in force. The sole legal issue is whether the term "Plant," as used in the Documents, means only the manufacturing facility (*i.e.,* the plant itself), or includes the land on which the facility is located. The Superior Court held as a matter of law that the term "Plant" includes the underlying land.[1] Although the parties agreed that the term "Plant" is not ambiguous, we conclude otherwise and hold that the meaning of "Plant" was not correctly determined as a matter of fact or law on this record.[2] Accordingly, we reverse the grant of judgment in favor of duPont and remand the case to the trial court for further proceedings.

### FACTS

The Club is a golf and country club located in Seaford, Delaware. duPont is a specialty chemical company, headquartered in Wilmington, Delaware, that conducts worldwide operations. duPont owned and operated a nylon textile manufacturing plant located in Seaford, Delaware from 1939 until November 2003, when duPont sold that business to Arteva Specialties, S.à.r.l. ("Arteva").

### The Consent Order

On February 25, 1992, several years before the parties' dealings that led to this dispute, duPont and the United States Environmental Protection Agency ("EPA") entered into a Consent Order that provided for the performance of interim measures at the plant site, and also at certain leased premises, to prevent or relieve threats to human health or the environment. One such measure was an investigation of the plant facility to determine where there was any release of hazardous waste, and to identify and evaluate alternatives for corrective measures and their implementation. The Consent Order contained findings of fact to which the EPA and duPont stipulated. One finding, which is pertinent to this litigation, states:

> Respondent [duPont] owns and operates a nylon textile manufacturing plant located at 400 Woodland Park, Seaford, Delaware. The Plant, the property on which the plant is located and all contiguous property under the ownership or control of Respondent, is referred to in this Consent Order as the "Facility." The Facility has been owned and operated by Respondent since commencement of production in 1939.[3]

---

1. *Seaford Golf and Country Club v. E.I. duPont de Nemours and Company,* 2006 WL 2666215 (Del.Super.) ("Opinion").

2. The parties advised the Superior Court that "a trial was unnecessary as nothing additional would be offered to assist the Court, as the trier of the facts, in making the [merits] deci-

sion." Opinion, 2006 WL 2666215, at *5. As a consequence, the trial court treated the matter as a determination of the merits after final hearing.

3. The Consent Order was incorporated into the ground lease by reference and attached as an exhibit to that document.

### The Documents

#### (1) *The Deed*

On December 26, 1995, duPont executed a deed ("the Deed") conveying to the Club approximately 100 acres of land, together with improvements ("the Property"), on which was located a clubhouse, swimming pool, tennis courts, a nine-hole golf course, and related facilities. The Deed contained a restriction (the "Deed Restriction") that provides:

> Grantee [the Club], its successors and assigns, agree to limit the use of the Property for golf, country club and related purposes, so long as Grantor [duPont] continues to own its Seaford, Delaware Plant; provided, however, that this restriction shall not apply to the portion of the Property as follows: [there follows a description of 4.1578 acres of land located on Locust Street, Seaford, Delaware.]

The Deed contains no definition of "Seaford, Delaware Plant" or "Plant." [4]

#### (2) *The Ground Lease and Memorandum of Lease*

On November 26, 1997, the parties executed a Ground Lease wherein duPont leased two parcels of land, totaling approximately 100.5 acres (the "leased premises"), to the Club. On that same date, the parties executed (and later recorded) a Memorandum of Ground Lease. Paragraph 3 of the Memorandum of Ground Lease contains a Right of First Refusal that pertinently provides:

> DUPONT reserves a right of first refusal to match within thirty (30) days any offer to purchase the Original Parcel as defined in the Option Agreement between the parties hereto dated October 18, 1995 and the leasehold interest in the LEASED PREMISES that is acceptable to [the Club]. Said right of first refusal will terminate upon the refusal by DUPONT to purchase and/or DUPONT transfers all of its title and interest in and to the Seaford, Delaware Plant.

The Ground Lease also contains a similarly worded right of first refusal, which provides (*inter alia*) that the "right of first refusal will terminate upon the refusal of DUPONT to purchase and/or DUPONT transfers all of its title and interest in and to the Seaford, Delaware Plant."

Neither the Ground Lease nor the Memorandum of Lease defines the terms "Seaford, Delaware Plant" or "Plant." Section 11 of the Ground Lease does, however, contain a provision that distinguishes between the Plant and the property upon which the plant is located:

> DUPONT entered into a Consent order (with the Environmental Protection Agency) ... a copy of which is attached hereto as Exhibit "C" to conduct RCRA Facility Investigation ... to determine the nature and extent of any release of hazardous waste and/or hazardous constituents at certain ... solid waste management units ... *on the DUPONT Seaford Plant property ("the Site")*. (emphasis added).

### The Pre–Document Negotiations

Although it is narrated out of temporal sequence, what follows is a summary of the parties' negotiations, insofar as they are disclosed by the current record,[5] that led to the drafting and execution of the Documents described above.

On February 23, 1994, duPont sent to the Club a letter offering to sell to the Club certain property in Seaford, Dela-

---

4. Elsewhere, however, the Deed contains a reference to "Grantor's Plant operation which adjoins the Property."

5. The facts relating to the pre-contract negotiations are recited at pages *2 and *3 of the Opinion.

ware, subject to the terms set forth in the letter. The offer stated that, "if DuPont should in the future divest itself entirely of the Seaford Plant, then we will agree to remove the [deed] restriction" A right of first refusal was included with the letter, which stated that "DuPont will relinquish the right of [first refusal] upon total divestiture of the Seaford Plant."

The Club rejected duPont's initial offer, and in an April 28, 1994 memorandum, made a counteroffer that (among other things) proposed a deed restriction. The Club stated: "Grantor may include in the Deed a restriction restricting use of the property to golf, country club and related purposes until the first of the following events should occur: (a) The expiration of 25 years from the date of the Deed; or (b) Grantor's total divestiture (to be defined) of the Seaford Plant." duPont accepted this counteroffer, except for the 25 year term of restriction (alternative [a]), which was deleted.

On June 2, 1994, duPont's property manager, Harry S. Thomas, sent to David R. Hackett, Esquire, the Club's attorney, an Agreement of Sale and a Ground Lease to review. The Agreement of Sale provided that the Deed would include "a restriction restricting the use of all but a portion of the property along Locust Street to golf and country club related activities for as long as DUPONT continues to own any of DUPONT's Seaford, Delaware Plant." Although the counteroffer and acceptance would have required that the restriction remain until duPont's "total divestiture of the Seaford plant," the proposed Agreement of Sale did not use the term "total divestiture." Nor was the Right of First Refusal mentioned in either the Agreement of Sale or the Ground Lease.

The negotiations continued throughout the summer of 1994. In a September 27, 1994 letter from the Club's attorney to Fred Ayers, duPont's then property man-

ager, the Club's counsel summarized the Club's understanding of the transaction terms upon which the parties had agreed as of August 26, 1994. That letter referenced the Deed Restriction and the Right of First Refusal and discussed the inclusion of the "total divestiture" language in the counteroffer and acceptance.

Thereafter, further negotiations took place to amend the current lease of the Club's property to add an option to purchase, and also to provide for an interim lease pending the exercise of the option. In a January 5, 1995 letter, duPont expressed its nonbinding intention to enter into a lease amendment with an option to purchase. In response, the Club, on January 10, 1995, submitted a new offer in which the Club again used the "total divestiture" language in relation to the Deed Restriction and the Right of First Refusal. In a February 24, 1995 letter, the Club's counsel offered to prepare the option agreement with the long term lease and interim lease, but duPont did not accept counsel's offer to do so.

In a March 7, 1995 letter, the Club requested that the option to purchase include the Right of First Refusal contained in the June 24, 1994 revised Agreement of Sale, which included the above-described "total divestiture" language. This provision also stated that "DuPont's total divestiture shall mean when DuPont no longer holds legal interest in the DuPont Plant Property." duPont rejected this proposed language, and instead chose to use the language that appears in the definitive Deed Restriction and the Right of First Refusal, throughout all future drafts of the Documents. That Deed Restriction language provides that the restriction will apply "as long as GRANTOR [DuPont] continues to own its Seaford, Delaware Plant." The Right of First Refusal language provides that it will terminate "upon refusal by DUPONT to purchase and/or

DUPONT transfers all of its title and interest in and to the Seaford, Delaware Plant." Similar language appears in the Right of First Refusal contained in the Ground Lease.

### Sale of the Seaford, Delaware Plant to Arteva

On November 16, 2003, duPont and Arteva entered into a Purchase Agreement wherein duPont sold to Arteva all "Improvements," "Equipment," and other "[DuPont] Business Assets" utilized in the business activities of the nylon business comprising the Textiles and Interiors business segment of DuPont ... located in Seaford, Delaware.[6] The transaction was consummated with the execution and delivery of an April 30, 2004 instrument of assignment and bill of sale, a March 30, 2004 ground lease, and an April 30, 2004 memorandum of ground lease. Under the ground lease, duPont leased the Seaford, Delaware "Plant Site" (as defined in the Ground Lease) to Arteva. The memorandum of ground lease stated that the leased land is "also known as the Seaford Plant Site."

In this transaction, duPont retained title to the Seaford Plant Site for purposes of remediating the "Existing Contamination" as defined in the Arteva transaction documents. Unlike the Ground Lease with the Club, the ground lease with Arteva provided that, upon satisfaction of certain conditions specified in the purchase agreement, the Arteva ground lease will terminate and title to the land upon which the plant is located and the other leased premises shall be transferred by duPont to Arteva.

### The Club Agrees To Sell A Portion Of The Property And duPont Invokes The Deed Restriction And The Right of First Refusal

On July 16, 2004, the Club entered into a contract with East Bay Homes, LLC and Vision Builders, Inc. ("the Developers") to sell a portion of the Property consisting of about 3.35 acres of land. After the Club gave duPont notice of the prospective sale, duPont wrote a letter to the Club on October 5, 2005, taking the position that until duPont actually sells the land, the Deed Restriction and Right of First Refusal remain in effect. Additionally, on December 16, 2004, duPont notified the Club that the Club had failed to abide by, and thus was in default of, the terms of the Right of First Refusal contained in the Ground Lease.

On December 16, 2004, the Club, through its counsel, responded to duPont. The Club took the position that it was not in default of the Ground Lease, because the Deed Restriction and Right of First Refusal had terminated when duPont sold its Seaford, Delaware nylon plant operation to Arteva in 2003. The Club offered, nonetheless, to sell to duPont a portion of the Property on the same terms proposed by the Developers. duPont did not respond to that offer, and by letter dated January 11, 2005, asserted that the Club's position was "unsupportable."

Thereafter, the Club filed an action in the Superior Court seeking a declaration that the Deed Restriction and the Right of First Refusal are unenforceable against the Club, because the terms "Plant" and "Seaford, Delaware Plant," as used in the Documents do not include the land underlying the plant facility. duPont interposed a counterclaim, seeking a contrary declaration, and that the Deed Restriction and the Right of First Refusal continue to be applicable and enforceable.

### THE SUPERIOR COURT'S OPINION AND THE PARTIES' CONTENTIONS

■ In support of their cross summary judgment motions, the parties argued, and

---

6. The quoted terms were defined in the Purchase Agreement.

the Superior Court agreed, that under the "objective" theory of contracts,[7] "a court must ... apply the plain meaning of an unambiguous term in the context of contract language and circumstances insofar as the parties would have agreed *ex ante.*"[8] At issue was the "plain meaning" of the terms "Plant" and "Seaford, Delaware Plant" as used in the Documents. In support of its respective position, each side cited dictionary definitions and case law.

The trial court concluded, however, that "the definitions and cases are not helpful as there is no clear objective definition," and that "[u]ltimately, '[t]he words employed by contract drafters must be evaluated in light of the apparent purposes of the drafters."[9] The trial court then reasoned as follows:

> Here, in looking at all the documents and using each to help construe the other, I find the plain meaning of the terms "Seaford, Delaware Plant" and "Plant" include land along with the nylon manufacturing operation. First, a reasonable party would interpret these terms as a place not the operations. A place includes the land. The description is the Seaford, Delaware Plant. Second, the parties used the language "transfers all of its title and interest in and to" and "as long as GRANTOR continues to own." The words objectively mean that the parties understood the conditions and restrictions to remain in place until duPont was rid of all its interest. The use of this broad encompassing language supports duPont's position. Thus, when applying the ordinary plain meaning of

the term "Seaford, Delaware Plant," duPont cannot be found to have "transferred all of its title and interest in" or "not continue[d] to own its Seaford, Delaware Plant" when it still holds title to the land that the nylon manufacturing operation is located on. Therefore, the Deed Restriction and Right of First Refusal are continuing to be in effect.... [10]

Having determined the plain meaning of the disputed contract language on the assumption that those terms are unambiguous, the trial court then analyzed the disputed provisions and reached the same conclusion, based on the alternative assumption that those terms are ambiguous. Specifically, the trial court held:

> DuPont included in its earliest communications that the restrictions would remain until "total divestiture." The Club even suggested that "total divestiture" as used in the negotiations meant including the land. Thus, the Club contemplated and knew that the restrictions would continue as long as duPont owned the land on which the nylon manufacturing operation sits. The Club cannot now say that if the definition they suggested was not included, or their exact wording was not, then duPont must have meant for the terms not to include the land. This rationale is not appropriate because the Club believed and understood that the land was included at the time the negotiations took place and when the agreements were drafted. Further, it is unreasonable to believe that duPont would want to read the restrictions more

7. "The objective theory provides that a contract's construction is judged to be what an objective reasonable third party would understand the terms to mean." Opinion, 2006 WL 2666215, at *5 (citing *Sanders v. Wang,* 1999 WL 1044880, at *6 (Del.Ch. Nov. 8, 1999)).

8. *Id.* (quoting *Lorillard Tobacco Co. v. American Legacy Foundation,* 903 A.2d 728, 740 (Del.2006)).

9. *Id.* at *11 (quoting *Telcom–SNI Investors, L.L.C. v. Sorrento Networks, Inc.,* 2001 WL 1117505, at *6 (Del.Ch. Sept. 7, 2001)).

10. *Id.* at *11.

narrowly than its original position and with less protection than what the Club had communicated to duPont through the Club's suggested language. There is nothing in the record to suggest that this was even an important issue in the negotiations. The parties were on the same page as to intent, even if duPont did not formally adopt the Club's language. Therefore, alternatively, even if the terms are deemed to be ambiguous, they are interpreted to include the land, so the Right of First Refusal and the Deed Restriction are still in place.[11]

## ANALYSIS

■ The issue presented is whether the Superior Court erred in determining as a matter of law, on this record, that the terms "Plant" and "Seaford, Delaware Plant" included the land on which the manufacturing facility was situated, as distinguished from the facility itself. Our review of a grant of summary judgment is *de*

*novo.*[12] Additionally, this Court reviews both the trial court's interpretation of the contract language and its legal conclusions *de novo.*[13]

■ The analysis must begin with the question of whether the terms "Plant" and "Seaford, Delaware Plant" have a plain meaning that comprehends not just the nylon and textile manufacturing facility, but also the land on which that facility was situated.[14] The trial court held that that was the plain meaning of those terms.

That determination, however, encounters two insuperable obstacles. The first is that neither "Plant" nor "Seaford, Delaware Plant" is defined in the Documents. In such circumstances, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms that are not contractually defined.[15] That leads to the second obstacle, which is that on this issue the dictionary definitions are not in accord and go both ways.

The Club cites various dictionary definitions,[16] as does duPont.[17] The definitions

11. Opinion, 2006 WL 2666215, at *11.

12. *Lorillard Tobacco Co. v. American Legacy Foundation,* 903 A.2d 728, 738 (Del.2006)

13. *Klair v. Reese,* 531 A.2d 219, 222 (Del. 1987); *see Rohn Indus., Inc. v. Platinum Equity LLC,* 911 A.2d 379 (Del.2006).

14. "When the language of a ... contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented...." *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195–96 (quotations and citations omitted).

15. *Lorillard Tobacco, supra,* 903 A.2d at 738.

16. *E.g., Websters Third New International Dictionary* (1993) ("3b: a factory or workshop for the manufacture of a particular product"); *The American Heritage Dictionary of the English Language* (4th ed. 2000) ("2a. A building or group of buildings for the manufacture

of a product; a factory. b. The equipment, including machinery, tools, instruments, and fixtures and the buildings containing them, necessary for an industrial or manufacturing operation."); The *American College Dictionary* (1993) ("5. the equipment, including the fixtures, machinery, tools, etc., and often the buildings, necessary to carry on any industrial business; a manufacturing plant."); *Oxford English Dictionary* (2d ed., 1989) ("The fixtures, implements, machinery and apparatus used in carrying on any industrial process...."); *Oxford American Dictionary and Language Guide* (1999) ("2a. machinery, fixtures, etc., used in industrial processes. b. a factory."); *The Shorter Oxford English Dictionary* (5th ed. 2002) ("Machinery, fixtures, and apparatus used in an industrial or engineering process; a single machine or large piece of apparatus ... a factory."); *Black's Law Dictionary* 1309 (4th ed. 1957) ("[t]he fixtures, tools, machinery, and apparatus which are necessary to carry on a trade or business."); *Ballentine's Law Dictionary* (3rd ed. 1969) ("[a] factory or place where an industry is conducted, inclusive of the machines and instrumentalities therein contained.").

cited by each side support its argued-for definition of "plant." Unfortunately, those dictionary definitions do not yield a uniform, single, plain meaning; that is, dictionary definitions can be found to support either view. The parties also cited case law authority to support their respective positions, but the Superior Court found those cases to be distinguishable and not helpful in establishing the plain meaning of the term "plant." [18] Nonetheless, the Superior Court found that "plant" did have a plain meaning that included the land on which the manufacturing facility is located.

We conclude, however, the term "plant" has no established plain meaning. Because that term is susceptible to either or both of the interpretations being advocated here, it inescapably follows that the terms "Plant" and "Seaford, Delaware Plant," as used in the Documents, are ambiguous. Although the trial court reached the opposite conclusion, it did, nonetheless, take into account the alternative possibility that "Plant" might be deemed ambiguous. On that alternative basis, the trial judge then proceeded to determine the contracting parties' intent, by considering extrinsic evidence. The issue is whether the Superior Court correctly found, on this record, that "Plant" and "Seaford, Delaware Plant," as used in the Documents, included the land upon which the manufacturing facility was located. We conclude that that finding was not the product of an orderly reasoning process that takes into account the evidence and facts pointing to an opposite result. We must therefore remand the

case for a new fact-finding process, with leave to enlarge the record.

The trial court reached its conclusion by selectively considering the material facts. The court's reasoning may be summarized thusly: In its earliest communications, duPont took the position that the Deed Restriction would remain until the "total divestiture" of the plant. The Club itself suggested in its correspondence that "total divestiture" included divestiture of the land as well as the facility. Thus, the Club "contemplated and knew" that the restrictions would continue as long as duPont owned the land on which the nylon manufacturing operation sits. That being the case (the trial court reasoned), the Club cannot now argue that if the definition they suggested was not included, or their exact wording was not used, then duPont must have intended for the term "Plant" not to include the land. Moreover, it is unreasonable to believe that duPont would want the restrictions to be read more narrowly than its original position, and with less protection than what the Club, by its own suggested language, had communicated to duPont. Thus, the Superior Court concluded, "[t]he parties were on the same page as to intent, even if DuPont did not formally adopt the Club's language. Therefore, alternatively, even if the terms are deemed to be ambiguous, they are interpreted to include the land, so the Right of First Refusal and the Deed Restriction are still in place." [19]

The trial court's interpretation of the facts of record is reasonable. The difficul-

---

17. *E.g., Merriam–Webster Online Dictionary, http://www.m-w.com* ("2a: the land, buildings, machinery, apparatus, and fixtures employed in carrying on a trade or industrial business."); *The Shorter Oxford English Dictionary* (5th ed. 2002) ("Machinery, fixtures, and apparatus used in an industrial or engineering process; a single machine or large piece of apparatus. Also, the premises, fittings, and equipment of a business or institu-

tion; a factory."); *The Oxford English Dictionary* (2d ed. 1989) ("the premises and fixtures of a business; [and] a place where an industrial process is carried on."). "Premises" is defined in *Dictionary.com* as "a tract of land including its buildings."

18. Opinion, 2006 WL 2666215, at *7–8.

19. Opinion, 2006 WL 2666215, at *11.

ty, however, is that its analysis ignores other record facts that support an equally reasonable but opposite interpretation. Despite the trial court's contrary supposition, it would not be unreasonable for an objective fact finder to conclude that du-Pont rejected the Club's proffered language because duPont did *not* intend for the term "Plant" to include the land underlying the manufacturing facility. The following undisputed facts support that inference.

First, if duPont intended for the terms "Plant" and "Seaford, Delaware Plant" to include the land, it knew how to express that intent. Two examples suffice to make the point. The 1992 Consent Order between duPont and the EPA, which recited that duPont "owns and operates a nylon textile manufacturing plant located at ... Seaford, Delaware," clearly distinguished between *"The Plant"* and *"the property on which the plant is located."* [20] And, in the Ground Lease duPont similarly distinguished between the "Plant" and the "property" on which the plant was located, as shown by the following Ground Lease recital:

> DUPONT entered into a Consent Order [with the EPA] ... to conduct [an] investigation ... to determine the nature and extent of any release of hazardous waste and/or hazardous constituents ... *on the DUPONT Seaford Plant property (the "Site")*.[21]

Had duPont desired for the term "Plant" and "Seaford, Delaware Plant" to include the land underlying the nylon manufacturing facility for purposes of the Deed Restriction and Right of First Refusal, all duPont needed to do was employ language similar to that used in the Consent Order or the Ground Lease. duPont could have accomplished that by using the Club's draft Ground Lease, which provided that the Right of First Refusal would terminate "upon DuPont's total divestiture of its interest in the Plant Property," and which defined "Plant Property" as the parcel of land on which duPont "*currently operates its Seaford, Delaware nylon plant....*" [22] But, duPont rejected that language, choosing instead to use the unqualified terms "Plant" and "Seaford, Delaware Plant,"—terms that, in other instruments, were distinguished from the "plant property" (in one case) or (in another case) from "the property on which the plant is located."

The foregoing facts would permit a fact finder to draw, equally reasonably, an inference and conclusion completely opposite to that reached by the Superior Court. That is, a fact finder could reasonably conclude that duPont did *not* intend that the land underlying the manufacturing facility must be sold or otherwise divested for the Deed Restriction and Right of First Refusal to terminate. Yet, in reaching its contrary factual determination, the trial court did not address the undisputed facts that point to that possible contrary result.

In this case, because the parties had filed cross motions for summary judgment and had stipulated that there were no material issues of fact, the trial court properly deemed the cross motions "to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." [23] That stipulation gave the trial court some (but not all) of the ultimate fact-finding latitude that a court would have in a bench trial. Those fact-

---

20. *Id.* at * 1.

21. See p. 1257, *infra* (italics added).

22. Opinion, 2006 WL 2666215, at *3.

23. *Id.* at *5 (quoting *Emmons v. Hartford Underwriters Ins. Co.,* 697 A.2d 742, 745 (Del. 1997)).

finding powers, although broad, were not limitless, because this case involved a paper record, not live testimony that the trial court was free to accept or reject on credibility grounds. Hence, the trial court's fact-finding powers were subject to the constraint that the found facts must be supported by the evidence and "the product of an orderly and logical reasoning process."[24]

In this case, the trial court did not assess or take into account the facts undercutting the conclusion that the court ultimately reached. Nor did the trial court set forth reasons why the equally reasonable contrary inference permitted by those facts should be rejected. We are, therefore, unable to conclude that the Superior Court's findings as to the parties' contractual content were the product of an "orderly and logical reasoning process,"[25] because the trial court's opinion does not explain how the totality of the evidence preponderates in favor of the court's contractual intent finding.

Second, although the Superior Court found that the Club "contemplated and knew" and "believed and understood" that the land, as well as the manufacturing facility, must be sold or otherwise divested in order for the Deed Restriction and Right of First Refusal to terminate, there is nothing of record that shows what duPont specifically intended or that the Club specifically knew of duPont's intent. Thus, insofar as the Superior Court found that the Club knew of duPont's intent and implicitly assented to it, that finding lacks evidentiary support and cannot be upheld either.

By the foregoing we do not mean to suggest that the Superior Court arrived at an incorrect result. Although that result cannot be upheld at this stage, it may ultimately be proved correct. For that to occur, however, it must be demonstrated through an articulated reasoning process that, despite the conflicting inferences, the weight of the evidence (and undisputed facts) preponderates in duPont's favor. For that reason the case must be remanded for a new fact-finding that takes into account all the material facts, determines whether (and if so, why) the facts preponderate in one direction or another, and, if the facts are found to be in equipoise (*i.e.,* if each of the contrary inferences is found to be equally plausible), which side has met (and/or failed to meet) its burden of proof.

In fairness to the trial court, this fact finding process need not be limited to the current record or even a paper record. In many contract cases involving a material ambiguity that must be resolved by extrinsic evidence, the record often includes the testimony of the persons who negotiated the disputed contract terms. Such testimony can shed valuable light on why specific contract language was (or was not) chosen. Notably, in this case none of the persons involved in the contract negotiations was even deposed, let alone called upon to testify. If such testimony was available, the failure to include it, either by way of deposition or affidavit, handicapped the trial court in its ability to assess the conflicting inferences in an orderly way. Although we do not require it, on remand the trial court may wish to consider directing the parties to enlarge the record to include the testimony (whether by deposition or live) of the persons who negotiated the Documents.[26]

---

24. *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 50 (Del.2006).

25. *Levitt v. Bouvier,* 287 A.2d 671 (Del.1972).

26. We note that such action may require David R. Hackett, Esquire to withdraw his appearance as attorney for the appellant. *See Matter of Estate of Waters,* 647 A.2d 1091 (Del.1994)

## CONCLUSION

For the reasons set forth, the judgment of the Superior Court is reversed, and the case is remanded for proceedings consistent with this opinion.