COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

December 3, 2015

Bradley R. Aronstam, Esquire
Ross Aronstam & Moritz LLP
100 S. West Street, Suite 400
Wilmington, DE  19801

C. Malcolm Cochran, IV, Esquire
Richards, Layton & Finger, P.A.
920 N. King Street
Wilmington, DE  19801

Re:  *Rexam Incorporated v. Berry Plastics Corporation*
C.A. No. 10596-VCN
Date Submitted:  July 24, 2015

Dear Counsel:

Plaintiffs Rexam Incorporated, Rexam PLC, and Rexam Overseas Holdings Limited ("Rexam") and Defendant Berry Plastics Corporation ("Berry") have a dispute about the risks of potential pension liability.  In March 2014, Berry agreed to purchase Rexam's Healthcare Containers and Closures business (the "Transaction") in accordance with the Equity Purchase Agreement.[1]  Berry accepted responsibility for the pensions of certain employees at one of Rexam's facilities that it was acquiring (the "Rexam Pension Plan").[2]  In May 2014, just

---

[1] The Equity Purchase Agreement, as amended, appears as Exhibits A & B to the Verified Complaint (the "Compl.").

[2] For convenience, Berry's anticipated assumption of the Rexam Pension Plan is referred to as the "Pension Plan Transfer."  Berry agreed to establish a new pension

before the anticipated closing, the Pension Benefit Guaranty Corporation (the

"PBGC") notified Rexam that it had initiated an inquiry into the Pension Plan

Transfer (the "PBGC Inquiry").[3]  The PBGC was concerned about the adequacy of

the funding for the pension plan that would become Berry's obligation and Berry's

ability to support the plan.  More specifically, the inquiry was targeted at the

calculation of the assets and liabilities to be transferred to the new Berry plan.[4]

The parties addressed the uncertainty introduced by the PBGC Inquiry in

advance of closing, which occurred on June 2, 2014.  As part of the closing, they

executed the "Side Letter" in which they agreed to defer the Pension Plan Transfer

"until the earlier of (i) the date the PBGC issues written notification that the PBGC

Inquiry is closed (the 'Resolution Date') or (ii) one hundred and eighty (180) days

after the Rexam Closing Date [December 2, 2014] (the 'Outside Date') (such

period from the date of this letter until the earlier of the Resolution Date or the

---

program under the Employment Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. § 18, which would receive the assets and liabilities of the
Rexam Pension Plan.

[3] The PBGC had received notice of the Pension Plan Transfer in April 2014.

[4] The PBGC letter, dated May 6, 2014, requested information "[t]o assist the
PBGC in understanding the impact, if any, of the [Transaction] on the Rexam
Pension Plan."  Compl. Ex. C.

Outside Date, the 'Standstill Period')."[5]

The parties then addressed how they would proceed upon expiration of the

Standstill Period:

> If the Standstill Period ends on . . . (ii) the Outside Date and there is no pending or threatened legal or administrative action by the PBGC with respect to the PBGC Inquiry, then . . . the parties shall complete the Rexam Pension Plan transfer as provided in the [Equity Purchase Agreement]. If the Standstill Period ends on the Outside Date and there is pending or threatened legal or administrative action by the PBGC with respect to the PBGC Inquiry, Berry may elect to (i) complete the Rexam Pension Pan transfer as provided in the [Equity Purchase Agreement] or (ii) cause the provisions of . . . the [Equity Purchase Agreement requiring Berry to accept the Pension Plan Transfer] to be void and of no effect. In the event Berry elects option (ii) in the immediately preceding sentence, [Rexam] shall retain all the pension assets and liabilities in the Rexam Pension Plan; and Berry will have no obligations or liabilities whatsoever with respect to the Rexam Pension Plan under the [Equity Purchase Agreement].[6]

---

[5] Compl. Ex. D (Consent to Defer Pension Plan Transfer (the "Side Letter")). The PBGC did not issue any written notification that it had closed the PBGC Inquiry. Thus, the Resolution Date did not occur.

[6] *Id.*

Information regarding the Rexam Pension Plan's assets and liabilities, and the underlying actuarial assumptions, had been provided to the PBGC[7] which on June 9, 2014, one week after closing, responded with an email which advised:

> We received your letter dated June 4. Unfortunately, we disagree with your conclusions. While there may be assumptions other than PBGC's that could be considered reasonable, we think the assumptions Rexam and its actuaries used (with the exception of the interest rate assumptions) to determine the asset transfer fall short of the reasonable standard. Furthermore, we are not convinced that this transfer satisfies the requirements for a *de minimis* spinoff under §1.414(1)-1(n)(2), or that the amount of assets being transferred meets the requirements of §1.414(1)-(1)(n)(1).
>
> We note that Rexam has chosen to transfer an underfunded plan . . . to a plan sponsor that is less likely to be able to support it, and are extremely disappointed that Rexam is not reconsidering its §414(1) spinoff assumptions. While PBGC does not plan to initiate legal action against Rexam at this time, we have not yet decided whether we will pursue this matter through the IRS and/or professional actuarial organizations.[8]

No other communications from the PBGC (or related governmental entities) have been received about the Pension Plan Transfer since then.

---

[7] *See, e.g.,* Compl. Ex. E (Rexam's June 4, 2014 letter). Rexam advised the PBGC that "the parties intend to move forward with the transfer of assets from the Rexam Plan to the Berry Plan based on the actuarial assumptions negotiated by the parties and specified in the Purchase Agreement." *Id.*

[8] Compl. Ex. F (the June 9 email).

The parties continued to work through various issues regarding the Pension Plan Transfer, but, on December 2, 2014, the "Outside Date" established by the Side Letter, Berry informed Rexam that it would not complete the Pension Plan Transfer because it considered the June 9 email from the PBGC "evidence of a pending or threatened legal or administrative action by the PBGC, which ha[d] not been resolved as of December 2, 2014."[9]

According to Rexam, this action violated Berry's duties under the Equity Purchase Agreement and the Side Letter. As a result, Rexam sent Berry an indemnification notice advising Berry that it would seek to recover losses that it would suffer if the Pension Plan Transfer did not occur.[10]

In brief, this is a contract dispute. Berry contends that its performance—acceptance of the Pension Plan Transfer—has been excused by the Side Letter because of the PBGC Inquiry and, in particular, the PBGC's email of June 9 which constitutes evidence of a pending or threatened legal or administrative action by

---

[9] Compl. Ex. G.

[10] Section 11.2 of the Equity Purchase Agreement identified specific performance as a remedy for the irreparable harm that Rexam would suffer in the event of a breach of the Equity Purchase Agreement, including a breach of the Pension Plan Transfer obligation.

the PBGC. Rexam, on the other hand, asserts that the June 9 email, and the passage of almost six months without other PBGC action, demonstrates that there was no "threatened PBGC action" as of the Outside Date and, thus, there is no reason for Berry not to complete the Pension Plan Transfer.

Rexam and Berry have both moved, under Court of Chancery Rule 12(c), for judgment on the pleadings.[11] A motion for judgment on the pleadings requires the Court to "accept[] the non-moving party's well-plead allegations as true and view[] all reasonable inferences in the non-moving party's favor."[12] "If a contract's meaning is unambiguous and the underlying facts necessary to its application are not in dispute, judgment on the pleadings is an appropriate procedural device for resolving the dispute."[13]

---

[11] Berry has also moved for summary judgment in accordance with Court of Chancery Rule 56.

[12] *MPT of Hoboken TRS, LLC v. HUMC Holdco, LLC*, 2014 WL 3611674 at *5 (Del. Ch. July 22, 2014).

[13] *CorVel Enter. Comp., Inc. v. Schaffer*, 2010 WL 2091212, at *1 (Del. Ch. May 19, 2010).

The parties do not disagree about the proper approach to interpretation of a contract.[14] Delaware law, with its objective theory of contracts, teaches that "a contract's construction should be that which would be understood by an objective, reasonable third party."[15] The Court strives to "give effect to the parties' intent based on the parties' words and the plain meaning of those words."[16] When the parties debate the meaning of a contractual term, the Court will, as a matter of law, select the interpretation that "better comports with the remaining contents of the document or gives effect to all the words in dispute."[17]

The question for the Court is deceptively easy to frame: as of December 2, 2014, was there a "threatened legal or administrative action by the PBGC with respect to the PBGC Inquiry"?[18] The focus of the Court's efforts will be on how to interpret "threatened," but before reaching that issue, the Court must first address a diversion created by Rexam regarding the import of "by the PBGC."

---

[14] The Equity Purchase Agreement, at Section 11.9, provides that Delaware law governs. By Section 11.10, the parties chose this Court for venue purposes. This Court has subject matter jurisdiction under 10 *Del. C.* § 341 and 6 *Del. C.* § 2708.

[15] *NBC Universal, Inc. v. Paxson Commc'ns Corp.*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005).

[16] *i/m$^x$ Info. Mgmt. Solutions, Inc. v. Multiplan, Inc.*, 2014 WL 1255944, at *5 (Del. Ch. Mar. 27, 2014).

[17] *Wills v. Morris James Hitchens & Williams*, 1998 WL 842325, at *2 (Del. Ch. Nov. 6, 1998).

[18] Compl. Ex. D. No such action was pending at the time, and Berry does not contend otherwise.

Rexam argues that the "threatened" action must be one by and of the PBGC and not by or of any other organization.[19] Berry suggests that its rights would be triggered as long as the PBGC threatened action, whether the action would be taken by the PBGC or by some other entity. Thus, according to Berry, "by the PBGC" links to "threatened" and not to "action." Whether (1) a threat by the PBGC that the PBGC or some other entity would take action or (2) a threat of action only to be taken by the PBGC was the intended meaning is less than clear; both readings are semantically plausible.

That, however, does not preclude an answer to the question because the PBGC does not work in a vacuum. Its work, as prescribed by statute and as demonstrated by undisputed facts, is intertwined with the special relationships among various administrative agencies of the federal government with overlapping or adjacent areas of direct responsibility. For example, the PBGC, the Internal Revenue Service, and the Department of Labor are all charged with administering ERISA.[20] The PBGC's role in any decision to pursue pension plan issues, such as the funding associated with the Pension Plan Transfer, is critical and, even if it turned out to be, for example, that the IRS would be the

---

[19] In essence, Rexam argues that the contractual threshold question is whether the PBGC threatened that the action would be undertaken and pursued by the PBGC.

[20] *See, e.g.*, *Blessitt v. Ret. Plan for Empls. of Dixie Engine Co.*, 848 F.2d 1164, 1167 (11th Cir. 1988).

governmental agency bringing the action, it would not only be an action by the IRS, but also by the PBGC because their functions cannot be so conveniently segregated.[21]

With that conclusion, the Court turns to the question of whether the PBGC "threatened" action. The PBGC announced that it had no then-current plans to bring any action. It did not use the word "threatened." It did not say that if something specific occurred, it would take action. Yet, it kept the possibility that it would take action very much alive—a viable option.[22]

What does the dictionary teach about the meaning of "threatened"?[23] One dictionary, chosen because of proximity, offers the following definition of "threatened":

---

[21] As the June 9 email related, "we have not yet decided whether we will pursue this matter through the IRS and/or [others]."

[22] Rexam emphasizes that for months after the PBGC's email, the parties continued as if the Pension Plan Transfer would be completed. It reasonably asks: "If Berry knew of the PBGC's concerns [and it did even before closing] and it had the benefit of the PBGC email [which it did shortly after the Side Letter], then why did it not raise objections before the very last day to do so?" That is a fair question, but there is at least one simple and obvious answer: Berry had no duty under the Side Letter to exercise its rights under the Side Letter until December 2, 2014.

[23] Drawing upon the dictionary is one method for ascertaining a word's meaning. *Seaford Golf & Country Club v. E.I. duPont de Nemours & Co.*, 925 A.2d 1255, 1261 (Del. 2007). Nonetheless, the question is what did the parties intend, not what some lexicologist thought.

    1.  To utter threats against; promise punishment, reprisal, or the like.

    2.  To give forewarning of, as by a threat, sign, etc.; hence, to hang over as a threat; as famine threatens the city.[24]

Did the PBGC "utter a threat"?[25] Probably not, because it did not state a present intention to do anything. Did it give warning that it might take action? Undoubtedly, it reserved the option to take action. That leaves open the question of whether advising that it "might" take action amounts to "threatened" action (perhaps in the sense of "to hang over as a threat") or whether the likelihood of any action must drift closer to "would."

Fortunately, this is not a novel question. This Court has recently reflected on the notion of "threatened."[26] It also started with the dictionary and framed the "relevant inquiry" as "whether QMC 'gave signs or warnings' to Multiplan that it was going to commence an Action regarding the Kaiser issue or announced to Multiplan that it intended to, or that it was possible that it would, commence an Action regarding the Kaiser issue." Its analysis continued:

---

[24] *Webster's New Collegiate Dictionary* 885 (1961) (italics omitted) ("Threaten implies warning in words . . . .").

[25] "Threat" is defined as "[t]he expression of an intention to inflict evil or injury to another; menace; threatening; denunciation." *Id.*

[26] *i/m^x*, 2014 WL 1255944, at *6-7.

> It appears that regardless of which definition is used, for QMC to have threatened to commence an Action against Multiplan, QMC would have to do more than simply notify Multiplan of a problem. Rather, QMC also must have expressed that it was going to do something about that problem, in such a way that a reasonable person would understand that QMC was intending to press the issue through a proceeding before a third party. In other words, . . . that "something" must be commencing an Action.[27]

The PBGC brought uncertainty and risk to the Transaction. The Side Letter was an effort to allocate (or to assuage concerns about) that risk. That the PBGC (or one of its allied agencies) would take action did not have to be a certainty before Berry could avoid responsibility for the Rexam Pension Plan. Yet, merely because the PBGC had a problem with the Transaction would not have allowed Berry a path to avoidance.[28]

Whether action was "threatened" should not, in this instance, be determined merely by focusing on a few isolated words in an email. Instead, the overall substance of the PBGC Inquiry must be considered. In sum, on the one hand, the PBGC identified concerns about the actuarial assumptions underlying the Pension

---

[27] *Id.* at *6.

[28] The drafters of the Side Letter chose a reasonable word: "threatened." What they apparently did not anticipate was the tepid, perhaps hesitant or equivocal, PBGC response.

Plan Transfer; indeed, in the June 9 email, it reported that it believed that the assumptions "[fell] short of the reasonable standard." It observed that Rexam "[had] chosen to transfer an underfunded plan." Berry was viewed as "a plan sponsor that is less likely to be able to support it." The PBGC was "disappointed" that Rexam was not reassessing its "spinoff assumptions." There is little room for doubt that the PBGC was quite unhappy with the Pension Plan Transfer.

On the other hand, despite all its reservations about the transfer, the PBGC gave no indication that it would do anything about the Pension Plan Transfer. It simply stated that it "[did] not plan to initiate legal action . . . at this time," and it expressly (even if unnecessarily) noted that it had "not yet decided whether . . . [to] pursue this matter."[29] Those ultimately are words of a frustrated governmental agency that, at least as of the time of the email, did not anticipate or suggest that it would likely pursue the matter. That is not a threat. It is merely an identification or a reservation of options, but it certainly does not amount to a no action letter. Nonetheless, the Side Letter allowed the Pension Plan Transfer to proceed with less certainty than a no action letter would have provided. Berry thus accepted a

---

[29] Compl. Ex. F.

degree of uncertainty, and the status of the PBGC Inquiry, based on the record before the Court, falls within that area of uncertainty that Berry accepted.

On these facts, Berry is not without risk that the PBGC might act, but there is nothing tilting in that direction. Ultimately, the PBGC has concerns and some disagreement with the actuarial approach of the parties, but it had no present intention to take any action and, at most, merely did what it had every right to do: preserve its options. Nothing suggests that the PBGC was "intending to press the issue . . . before a third party."[30] In this context and with the background of the dispute, that position is not one of threat. As noted, that Berry agreed to accept some risk is confirmed by its failure to require a "no further action" letter as a condition precedent to its assumption of responsibility for the Rexam Pension Plan.

The standard to which Berry and Rexam agreed is not whether it is possible that the PBGC will elect to enforce. The parties seemingly sought to avoid such speculation. Instead, they agreed upon "threatened" and, while Berry's apprehension is certainly understandable, the PBGC did not threaten to take action. It is a fine line, but sometimes fine lines must be drawn.

---

[30] *See supra* note 27 and accompanying text.

Accordingly, judgment on the pleadings will be entered in favor of Rexam and against Berry.[31]

Counsel are requested to confer and to submit an implementing form of order.

Very truly yours,

*/s/John W. Noble*

JWN/cap
cc:    Register in Chancery-K

---

[31] Berry suggests that Rexam cannot be entitled to judgment on the pleadings because there are facts that need to be developed. If the question were simply: what is the PBGC going to do?—then discovery might be necessary. The focus, however, as framed by the Side Letter, is on whether the PBGC "threatened" to take action, and that is to be determined by the communications from the PBGC and actions of the PBGC. The Side Letter is not ambiguous, and the issue is dependent upon an objective assessment of the PBGC's conduct, not a subjective evaluation of what it might be thinking. Thus, judgment on the pleadings is appropriate, and Berry's motion for summary judgment must be denied. In short, there are no disputed material facts that obstruct the grant of judgment in this instance.