Avesair, Inc. v. InPhonic, Inc., 2007 NCBC 32.

STATE OF NORTH CAROLINA         IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
COUNTY OF WAKE                           04 CVS 10838

| | |
|---|---|
| AVESAIR, INC., )<br>)<br>      Plaintiff, )<br>)<br>  v. )<br>)<br>INPHONIC, INC., )<br>)<br>      Defendant. ) | ORDER ON MOTIONS FOR<br>SUMMARY JUDGMENT |

{1}      This case arises out of Plaintiff's suit for breach of contract. This matter comes before the Court on Plaintiff and Defendant's Motions for Summary Judgment under Rule 56.

{2}      Upon review of the briefs and oral argument, the Court GRANTS Plaintiff's Motion for Summary Judgment and DENIES Defendant's Motion for Summary Judgment.

> *Smith Moore LLP by James L. Gale and Laura M. Loyek for Plaintiff Avesair, Inc.*
>
> *Patton Boggs LLP by Read K. McCaffrey and Hagan Davis Mangum Langley & Hale PLLC by J. Scott Hale for Defendant InPhonic, Inc.*

Tennille, Judge

I.

PROCEDURAL BACKGROUND

{3}      This action was filed in Wake County Superior Court on August 5, 2004. This matter was designated a complex business case under Rule 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts by order of the Chief Justice of the Supreme Court of North Carolina dated June 12, 2006, and

assigned to the undersigned Special Superior Court Judge for Complex Business Cases by virtue of the same order.

{4}     Defendant filed a Motion for Summary Judgment under Rule 56 on April 16, 2007.  Plaintiff filed a Motion for Summary Judgment under Rule 56 on April 26, 2007.  The Court heard oral arguments on both motions on June 14, 2007. The parties have engaged in mediation and, at the Court's urging, direct negotiations prior to this ruling.

## II.
## BACKGROUND
### A.
### THE PARTIES

{5}     Plaintiff Avesair, Inc. is a corporation organized under the laws of the State of Delaware which had its principal place of business in Cary, Wake County, North Carolina at all times relevant to this matter.  Plaintiff is now located in Raleigh, Wake County, North Carolina.

{6}     Defendant InPhonic, Inc. is a corporation organized under the laws of the State of Delaware.  InPhonic's principal place of business is Washington, D.C. InPhonic engages in business in North Carolina and maintained employees in Cary, Wake County, North Carolina.

### B.
### THE ASSET PURCHASE AGREEMENT

{7}     The parties are involved in mobile communications.  Plaintiff Avesair developed mobile marketing technology used to deliver targeted messages to mobile devices.  Defendant InPhonic distributes mobile phones and provides wireless voice and data solutions to consumers.

{8}     The parties negotiated an asset purchase between approximately December 1, 2002 and April 16, 2003.  (Compl. ¶¶ 10, 12.)  On or about April 16, 2003, the parties signed a non-binding letter of intent. (Compl. ¶ 12.)  On or about

May 13, 2003, the parties signed the Asset Purchase Agreement By and Between InPhonic, Inc. and Avesair, Inc. ("APA"). (Compl. ¶ 12.)

{9} The sections of the APA at issue are as follows:

If Buyer [Defendant InPhonic] achieves greater than $2,000,000 in gross revenues up to a maximum of $3,333,333 in gross revenues during the twelve (12) month period commencing April 1, 2003 and ending March 31, 2004 (the "Measuring Period") as a result of the sale of products or services derived from Seller's [Plaintiff Avesair's] Intellectual Property . . . Buyer shall, subject to the provisions of Section 2.9 below, issue to Seller within thirty (30) days following April 1, 2004, additional shares of Buyer's Common Stock in an amount equal to three dollars ($3.00) of Buyer's Common stock for each one dollar ($1.00) of any such gross revenue recognized by Buyer (the "Additional Shares").
(APA ¶ 2.6(a)(i).)

Notwithstanding Section 2.6(a)(i), if (1) Buyer fails to use Commercially Reasonable Efforts to sell products or services derived from Seller's Intellectual Property, (2) if outside audited financial information is not provided at the end of the Measuring Period, (3) or Buyer terminates more than one of the Transferred Employees hired by Buyer after the Closing . . . then Seller shall receive the number of Additional Shares equal to the maximum net revenues of $3,333,333.
(APA ¶ 2.6(a)(iii).)

For purposes of determining whether Seller is entitled to the Additional Shares pursuant to Section 2.6(a)(i) or Section 2.6(a)(iii) above on or before April 15, 2004, Buyer shall cause to be prepared and delivered to Seller a quarterly statement (the "Revenue Statement") signed by an officer of Buyer setting forth the actual amount of the gross revenue and the basis for such calculation. If, within thirty (30) days following receipt of the Revenue Statements . . . Seller has not given Buyer written notice of its objection to the Revenue Statement . . . then the Revenue Statement shall be deemed accepted by Seller and will be used to determine whether Seller is entitled to any Additional Shares pursuant Section 2.6(a)(i).
(APA ¶ 2.6(b).)

{10} Defendant provided Plaintiff with financial information on April 29, 2004. (Def.'s Mot. Summ. J. 4.) Defendant and Plaintiff disagreed as to whether this financial information was the Revenue Statement. (Def.'s Mot. Summ. J. 4.; Pl.'s Resp. to Def.'s Mot. Summ. J. n. 2.) Plaintiff gave Defendant written notice of

its objection to the financial information provided on April 29, 2004, on May 26, 2004. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 5.) If that financial information was the Revenue Statement, Plaintiff still objected within thirty days of receipt in accordance with APA ¶ 2.6(b).

{11}    Both Motions for Summary Judgment focus on whether Defendant provided the "outside audited financial information" required in the APA and whether Plaintiff is entitled to damages for failure to provide the Additional Shares specified in the APA.


III.

ANALYSIS

A.

LEGAL STANDARD

{12}    The APA is to be governed by and construed under the laws of the State of Delaware. (APA ¶ 8.8; Case Management Report ¶ q.) The North Carolina Supreme Court "has held that where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980). The "law of the forum, North Carolina, governs all matters of procedure" when a contract governed by another state's substantive law is litigated in North Carolina. *Taylor v. Abernethy*, 174 N.C. App. 93, 103, 620 S.E.2d 242, 249 (2005) (citing *Arnold v. Charles Enterprises*, 264 N.C. 92, 96, 141 S.E.2d 14, 17 (1965)). "The question of what is procedure and what is substance is determined by the law of the forum state." *Boudreau v. Baughman*, 322 N.C. 331, 339, 368 S.E.2d 849, 856 (1988).

{13}    Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to judgment as a matter of law." N.C. R. Civ. P. 56(c). "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues

exist." N.C. R. Civ. P. 56 cmt. The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g., Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). The Court must exercise caution in granting a motion for summary judgment. *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

B.

BREACH OF CONTRACT

{14}    The situation presented is a difficult one.[1] If Plaintiff prevails, it will receive a benefit that was not earned under the earnout provision of the contract, but results from a technical breach of contract by Defendant. If Defendant prevails it will escape liability for ignoring provisions expressly bargained for in the contract in order to prevent litigation. Neither the Court nor the parties have found middle ground for compromise. As a result, one must lose. The Court will present the equities on both sides and then explain why it has ruled in favor of Plaintiff.

{15}    The Delaware Supreme Court recognizes many of the same principles of contract construction as North Carolina. Contracts are to be "construed as a whole, to give effect to the intentions of the parties." *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del. 1996) (citations omitted). The Delaware Supreme Court construes contracts, and by extension the intent of the parties, by first using the plain meaning of the contract. *Seaford Golf & Country Club v. E.I. DuPont de Nemours & Co.*, 925 A.2d 1255, 1260 (2007) (citations omitted). It also holds to the *contra proferentem* principle of construction that any "ambiguities in a contract should be construed against the drafter." *Twin City Fire Ins. Co. v. Del.*

---

[1] The Court has actually drafted two opinions – each granting summary judgment to one party or the other. It can only enter one of those opinions.

*Racing Ass'n*, 840 A.2d 624, 630 (2003).[2]   If there is an ambiguity, the court is to turn once again to the plain meaning of the contract language to discern the intent of the parties.  *Northwestern*, 672 A.2d at 43.  Then the court is to look to extrinsic evidence for guidance in interpretation.  *Id.*

{16}    The terms of the APA called for the transfer of Plaintiff's assets, both tangible and intangible, in exchange for 672,389 shares of Defendant's Common Stock and 672,389 shares of Defendant's D-5 Preferred Stock. (APA ¶¶ 2.1, 2.5.) The monetary value of the exchange was $7 million worth of Defendant's stock for $2 million in cash and $5 million in assets.  (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 1. 7.)  Additionally, there was the possibility of $4 million worth of common shares if the earnout threshold was reached.  (*See* Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 1. 7 *and* APA ¶ 2.6(a)(i).)  If the earnout threshold was not met, the Plaintiff would not receive the Additional Shares.  (APA ¶ 2.6(a)(i).)  The up-front consideration with an earnout agreement in the form of stock is a common business practice.  *See, e.g.*, Dale Oesterle, *The Inexorable March Toward a Continuous Disclosure Requirement for Publicly Traded Corporations:* "Are We There Yet?," 20 Cardozo L. Rev. 135, 171-172 (1998) (presenting the steps common in merger negotiations, including exchanging stock and setting an earnout).

{17}    The APA also included a provision designed to avoid litigation over the earnout agreement.  (Pl.'s Resp. to Def.'s Mot. Summ. J. 12; APA ¶ 2.6(a)(iii).)  Mr. Frey, a member of the Board of Directors for Plaintiff, stated that the liquidated remedies of ¶ 2.6(a)(iii) relieved Plaintiff of the risk that it would lose the Additional Shares because of its failure "to sustain any such burden of proof" as to whether the earnout threshold had been met.  (Frey Aff. ¶ 10.)  The agreement acted to alleviate Plaintiff's burden of proving that the earnout threshold had been met.  (Frey Aff. ¶¶ 9-10.)  Plaintiff "agreed to a contract in which those revenues were presumed unless shown to be the contrary by outside audited financial information." (Frey Aff. ¶ 10.)

---

[2] For a concise statement of Delaware rules of construction regarding plain meaning interpretation and the intent of the parties, see *Haft v. Dart Group Corp.*, 841 F. Supp. 549, 564 (D. Del. 1993) and *In re Explorer Pipeline Co.*, 781 A.2d 705, 713-14 (Del. Ch. 2001).

Mr. Frey had experience with difficulties regarding earnout provisions and "carefully negotiated" the provision with this presumption. (Frey Aff. ¶ 10.) Plaintiff's concern was that once the APA was in place, it no longer had control over the utilization of its assets or the books and records of Defendant. (Pl.'s Resp. to Def.'s Mot. Summ. J. 12.)  Only by utilizing the assets through "commercial[ly] reasonable efforts" would Defendant's revenue be enough to trigger the earnout agreement thereby requiring it to provide Plaintiff with more stock. (Frey Aff. ¶ 8; Compl. ¶ 33.) It would be very difficult for Plaintiff to prove that Defendant did not use commercially reasonable efforts to utilize the assets without the outside audited financial agreement referenced in APA ¶ 2.6(a)(iii).[3] (Frey Aff. ¶ 10.) The parties agreed to damages as the maximum amount of Additional Shares Plaintiff could receive. (*Compare* APA ¶ 2.6(a)(iii) *and* APA ¶ 2.6(a)(i).) The damages encouraged Defendant to use commercially reasonable efforts and to provide the outside audited financial information to Plaintiff which it would need to dispute those efforts and the revenue. (Compl. ¶ 22.) Mr. Frey's uncontradicted testimony establishes that the audit provision was included to protect Plaintiff and avoid litigation.

{18}    However, provision 2.6(a)(iii) in relation to the earnout agreement created a windfall that may not have been expected, but should have been. Provision 2.6(a)(iii) is a windfall for different reasons. First, the amount of damages, almost $4 million at the end of the Measuring Period, is over half the total value of the contract. (Pl.'s Resp. to Def.'s Mot. Summ. J. Ex. 1. 7.) Second, the Additional Shares in 2.6(a)(i) were further compensation when an earnout threshold was met. (Pl's. Resp. to Def.'s Mot. Summ. J. Ex. 1. 7.; APA ¶ 2.6(a)(i).) Therefore, the Additional Shares were related to the value of the assets being transferred. In

---

[3] The Court notes that these motions only concern Plaintiff's first claim for relief – the Defendant's breach of the APA by failure to provide Additional Shares when it did not provide outside audited financial information. (Compl. ¶ 30.) The Plaintiff's second claim for relief – Defendant has not used Commercially Reasonable Efforts to sell [Plaintiff's] products and services, (Compl. ¶ 30), – is still outstanding. The receipt of the outside audited financial information would be at least beneficial (if not necessary) to the Plaintiff as it pursues this second claim for relief.

contrast, the Additional Shares under 2.6(a)(iii) were not further compensation but were liquidated damages. Those Additional Shares were related to a technical failure on the part of Defendant and not the value of the assets being transferred. (APA ¶ 2.6(a)(iii)(2).) The windfall could have been easily avoided in two ways. Defendant could have provided the outside audited financial information or, upon the decision to not provide the audited financials, the Additional Shares. (APA ¶ 2.6(a)(iii).)

{19} Defendant argues in a footnote that the Revenue Statement provided in April 2004 is in effect the "outside audited financial information" referred to in APA ¶ 2.6(a)(iii). (Def.'s Mot. Summ. J. 4.) Defendant then spends the remainder of its brief arguing that the provision awarding Plaintiff Additional Shares is an illegal penalty. The Court recognizes that the Additional Shares constitute a windfall to the Plaintiff even though the Court does not agree that the Additional Shares in the APA should be interpreted as an illegal penalty.

{20} Defendant argues that there is no question that the earnout targets were not reached and that Plaintiff's representatives were aware of that fact prior to the end of the period based upon information they were receiving from insiders who were former Avesair employees. Defendant also points to at least one instance in which Plaintiff took advantage of Defendant's mistakes to receive money it would not otherwise have been entitled to receive.[4] (Def.'s Resp. to Pl's Mot. Summ. J. 5.) The implication, not entirely unfair, is that Plaintiff made its demand for an audit to trap Defendant into breaching the contract as the only way to get at the earnout. There is no explanation provided for Defendant's failure to comply with the audit requirement other than Defendant's position that Plaintiff knew the audited material would not show the target had been met. (Def.'s Reply Br. 12.) Perhaps the failure to comply was only hubris at work in the decision not to comply with the contractual obligation. Perhaps it was the very ineptitude Plaintiff was relying upon. However, given Defendant's restatements of income, (*see infra* ¶ 27), the

---

[4] Those facts are unrefuted. Plaintiff argues they are irrelevant.

possibility exists that there was some other reason Defendant declined to have independent auditors look at the situation. The reason for Defendant's decision is not determinative. The decision itself triggers liability.

{21} APA ¶ 2.6(a)(iii) states that outside audited financial information was to be provided by the Defendant to the Plaintiff at the end of the Measuring Period. (APA ¶ 2.6(a)(iii).) The Measuring Period was defined as the "period commencing April 1, 2003 and ending March 31, 2004." (APA ¶ 2.6(a)(i).) Outside audited financial information is not defined. The Court recognizes that Delaware's rules of contract construction, specifically plain meaning interpretation of contract terms, apply. (*See supra* ¶ 15).

{22} According to the West Dictionary of Business Law Terms, "internal audit" is "[a]n audit conducted by an organization's personnel." *A Dictionary of Business Law Terms* (Bryan A. Garner, ed., 1999). In comparison, an "independent audit" is "[a]n audit conducted by an <u>outside</u> person or firm not connected with the organization being audited." *Id.* (emphasis added). While "outside audited financial information" is not explicitly defined in the referenced dictionary, the Court finds that the term is consistent with the definition of an independent audit and not an internal audit.

{23} The intent of providing the outside audited financial information was first to avoid litigation regarding the earnout threshold and second to provide Plaintiff with information on whether Defendant used commercially reasonable efforts to utilize the assets in the APA. (*Supra* ¶ 17). The contents of the outside audited financial information must bear on both the earnout threshold (revenue) and the efforts to utilize the assets (spending) to effectuate the intentions of the contract. The Revenue Statement does not meet the definition or the intention of "outside audited financial information."

{24} Using both a plain meaning interpretation of the contract and extrinsic evidence regarding the intention of the parties when entering into the contract, the Court finds that Defendant was required to provide something other than the Revenue Statement at the end of the Measuring Period, or a reasonable period

thereafter, which bore both on whether the earnout threshold had been met and whether Defendant used commercially reasonable efforts to utilize the assets in the APA.

{25} Defendant provided Plaintiff with its S-1 filing on July 7, 2004. (McCaffrey Aff. Ex. A.) This filing contained the audited consolidated balance sheets of InPhonic, Inc. and its subsidiaries as of December 31, 2003, and December 31, 2002. (McCaffrey Aff. Ex. A.) As Plaintiff aptly pointed out, the S-1 filing does not include the entire Measuring Period defined in the APA. (Pl.'s Reply Br. 2-3.) The S-1 filing also does not differentiate or focus on the financial information that relates to the earnout threshold or Defendant's obligation to use commercially reasonable efforts to utilize the assets. The S-1 filing provided on July 7, 2004, does not fulfill the requirement of APA ¶ 2.6(a)(iii)(2).

{26} In the current matter, the contract required the outside audited financial information to be provided at the end of the Measuring Period. (APA ¶ 2.6(a)(iii)(2).) However, the financial information was to include the entire Measuring Period. (APA ¶¶ 2.6(a)(i), (iii).) The ability to provide outside audited financial information on the last day the financial information was to include would be Herculean. As discussed above, (*supra* ¶ 17), the intent of the parties was to provide Plaintiff with information it would not otherwise have in order to contest either the earnout threshold revenues or Defendant's efforts to utilize the assets. Providing the outside audited financial information on the very day the Measuring Period ends is not necessary to effectuate these intentions. Instead, Plaintiff would need well-constructed financial information providing as much information as possible. Requiring the production of financial information in an extremely short time would not fulfill the desire for completeness. The Court finds no extrinsic evidence that would indicate that the provision of the outside audited financial information by the end of the Measuring Period was necessary to the APA. A reasonable period of at least sixty days would provide time to complete the required audit.

{27} Delaware courts will find a material breach when there has been no performance within a reasonable time. *Hifn, Inc. v. Intel Corp.*, C.A. No. 1835-VCS, 2007 Del. Ch. LEXIS 58, at *37. A reasonable time is inferred when there is no time for performance fixed in a time is of the essence clause. *Id.* (citing *J.A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 550 (Del. Super. 1977)). Whether the financial information or the Additional Shares were provided in a reasonable time is a question of fact. *Id.* at 38. In the present matter, neither the financial information nor the Additional Shares were ever provided. (*Supra* ¶¶ 19-20). The facts of this case make it clear that the outside audited financial information is still pertinent even at this late date. Specifically, Plaintiff notes that there is evidence that Defendant's financial statements are unreliable because Defendant has restated its income for the two periods directly subsequent to the relevant period. (Pl.'s Reply Br. 2.). If the statements are unreliable, Plaintiff will need the outside audited financial information to question whether the earnout threshold was truly not met. Also, Plaintiff still has a second cause of action pending in the present case, failure to use commercially reasonable efforts to sell the assets transferred in the APA. The audit provision was included to provide Plaintiff with independently verified information upon which it could rely in making a decision whether it had any rights to pursue under the contract. It had to decide to file this suit without that knowledge.

IV.

CONCLUSION

{28} The APA was drafted by Defendant, including the provisions regarding the Additional Shares.[5] (Frey Aff. ¶ 11.) The APA was also negotiated over a period of time in which Defendant could have objected to the Additional Shares

---

[5] The APA was drafted by Defendant's counsel, who are now in the role of belittling the contract for containing a liquidated damages provision it claims acts as an illegal penalty.

provisions.[6]  (Frey Aff. ¶ 11.)  These two facts put the Defendant in a tenuous position from which to challenge the APA.

{29}    Defendant contends that there were only two possible outcomes regarding the Additional Shares:  either revenue was higher than the earnout threshold and Plaintiff received Additional Shares, or revenue was lower than the earnout threshold and Plaintiff did not receive Additional Shares.  (Def. Reply Br. 2.)  However, a reading of APA ¶ 2.6(a)(iii) proposes a third outcome:  regardless of whether the earnout threshold was met, if Defendant did not provide Plaintiff with an outside audited financial statement, then Plaintiff received Additional Shares.  (APA ¶ 2.6(a)(iii).)  This third outcome is the situation before the Court.

{30}    The Court has given considerable thought to the issue of illegal penalties and liquidated damages raised by Defendant.  Damages that were worth $4 million at the time of the breach are indeed severe when juxtaposed to the original transaction.  The fact that these damages are the very maximum that Plaintiff could ever hope of receiving under the earnout agreement highlights the harshness of the amount.  (APA ¶¶ 2.6(a)(i), (iii).)  Defendant has articulated the Delaware test of liquidated damages.[7]  (Def.'s Mot. Summ. J. 7.)  Defendant has pointed out the inequity involved in allowing Plaintiff to take the Additional Shares simply because an outside audited financial statement was not provided. (Def.'s Mot. Summ. J. 4; Def.'s Resp. to Pl.'s Mot. Summ. J. 1–2.)

{31}    Plaintiff has not had completely clean hands during the time leading up to this matter.  Plaintiff was aware at the time the outside financial information was not provided that the earnout threshold under APA ¶ 2.6(a)(i) was most likely

---

[6] Neither this statement nor the previous statement regarding the drafting of the APA were objected to in Defendant's Reply Brief.

[7] "Where (1) the damages that would result from a breach are uncertain or incapable of accurate calculation by any accepted rule of law, and (2) the amount fixed is a reasonable forecast of such damages, the provision is one for liquidated damages and will be enforced like any other. Conversely, if the provision fails to meet one of these criteria, the damages stemming from a breach being easily ascertainable or the amount fixed excessive, the provision is void as a penalty." *W&G Seaford Assocs., L.P. v. E. Shore Mkts., Inc.*, 714 F.Supp. 1336, 1347 (1989) (citing *Wilmington Hous. Auth.*, 665 F.Supp. 351, 354 (1987)).

not met. (Def.'s Mot. Summ. J. 4-5.) Defendant cites several correspondences plainly outlining that Plaintiff had no expectation that the earnout threshold would be met. (Def.'s Mot. Summ. J. 4-5.) Plaintiff does not dispute the content of those correspondences but only disputes that Plaintiff had accepted that the earnout threshold had not been met. (Pl.'s Resp. to Def.'s Mot. Summ. J. 4.) Plaintiff is correct in that whether or not the earnout threshold was met is not at the crux of the current motion. (Pl.'s Resp. to Def.'s Mot. Summ. J. 4.) However, the intent of the outside audited financial information was to confirm the revenues that determined whether the earnout threshold had been met and to avoid litigation over that matter. (Pl.'s Resp. to Def.'s Mot. Summ. J. 11, 12; Pl.'s Mot. Summ. J. 4.) The intention of the parties lends itself to assigning damages.

{32} The Court has also considered the fact that Plaintiff did not file for specific performance to obtain the outside audited financial information, but instead has initiated this breach of contract action seeking damages which are significant compared to the scope of the underlying transaction. The Court finds it interesting that while the purpose of the damages provision in 2.6(a)(iii) was to avoid litigation, (*supra* ¶ 17), Plaintiff has initiated this suit based on that provision without seeking the outside audited financial information. Plaintiff did send one correspondence after the Measuring Period regarding the outside audited financial information, but that correspondence requested the Additional Shares and not the audited financial information.[8] (Pl.'s Resp. to Def'.'s Mot. Summ. J. Ex. 5.)

{33} As the Court noted earlier, (*supra* n. 3), Plaintiff still has another claim for relief pending. Plaintiff has accused Defendant of not using Commercially Reasonable Efforts to utilize the assets transferred under the APA. (Compl. ¶ 30.) To pursue this claim, Plaintiff could have used the outside audited financial information. The reasoning for requiring the outside audited financial information was two fold: to determine if commercially reasonable efforts were used and to

---

[8] In the same correspondence, Plaintiff objected to the financial information that had previously been provided by the Defendant.

check the accuracy of the Revenue Statement figures that would determine whether Plaintiff was to receive Additional Shares under APA ¶ 2.6(a)(i). The intent of the parties was to avoid litigation over both of these matters even though arbitration was not agreed to for breaches of APA ¶ 2.6(a)(iiii). (Compl. ¶ 32.)

{34} This is a difficult case. The Court has considered what alternatives it might have to reach some compromise that might appear fairer. Should the Court, on its own motion, require specific performance and order an independent audit requiring Defendant to pay Plaintiff's legal fees in obtaining the audit? No one asked for that relief. It would, in essence, deprive Plaintiff of the specific thing it bargained for – an audit or distribution of the shares without litigation over the earnout. The Court would be rewriting the contract. Should the Court find that there was a breach, but leave it to a jury to decide damages? Again, that remedy would deprive Plaintiff of its negotiated bargain, and the Court would be rewriting the contract.

{35} There is certainly a strong argument to be made that Plaintiff will receive a windfall and that it intentionally took advantage of Defendant's failure to understand its contractual obligations. In this Court's view, the more important consideration is the obligation of the courts to enforce contracts as they are written. This contract was negotiated at arm's length. It was drafted by Defendant. It contained one specific provision for the protection of Plaintiff in the earnout provisions. Defendant failed to comply with that provision. The contract is unambiguous with respect to the remedy for that failure. Plaintiff was entitled to a distribution of stock with a value of $3,999,999.99 upon Defendant's breach. The Court concludes that Defendant breached the contract and Plaintiff is entitled to damages in the amount of $3,999,999.99. Plaintiff is entitled to interest at the statutory rate from the date of breach, which the Court finds is a reasonable period of sixty days after the close of the earnout period to provide the audited statement, or May 31, 2004.

{36} The Court will not act to rewrite this contract nor will it save the Defendant from the consequences of its bargain. The Delaware Supreme Court

states appropriately that "the fundamental maxim [of contract construction is] that the parties are bound by the terms of their own agreement." *Harry H. Rosin Co. v. Eksterowicz*, 73 A.2d 648, 651 (Del. Ch. 1950). The Defendant finds itself in the unenviable position of being the party to a contract whose terms are burdensome, but which must be adhered to nonetheless.

{37} Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED:

1. Defendant's Motion for Summary Judgment is DENIED.
2. Plaintiff's Motion for Summary Judgment on Its First Claim for Relief is GRANTED
3. Plaintiff is entitled to recover $3,999,999.99 as damages for Defendant's breach of contract together with interest from the date of breach.

This the 16th day of October, 2007.