Lexington Furniture Indus., Inc. v. Bob Timberlake Collection, Inc., 2009 NCBC 22.

STATE OF NORTH CAROLINA

COUNTY OF DAVIDSON

LEXINGTON FURNITURE
INDUSTRIES, INC.,

              Plaintiff,

     v.

THE BOB TIMBERLAKE
COLLECTION, INC. and ROBERTS
E. "BOB" TIMBERLAKE,

              Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
08 CVS 02407

**ORDER AND OPINION ON
PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT**

{1}    This matter is before the Court on Plaintiff's Motion for Summary Judgment, filed February 9, 2009. For the reasons set forth below, the Court hereby GRANTS Plaintiff's Motion for Summary Judgment.

> *Smith Moore Leatherwood LLP by Richard A. Coughlin and C. Bailey King, Jr. for Plaintiff Lexington Furniture Industries, Inc.*
>
> *Brinkley Walser, PLLC by G. Thompson Miller and R.B. Smith, Jr. for Defendants The Bob Timberlake Collection, Inc. and Roberts E. "Bob" Timberlake.*

Tennille, Judge.

I.

PROCEDURAL BACKGROUND

{2}    Plaintiff filed the Notice of Designation contemporaneously with the Complaint in Davidson County on June 18, 2008. On June 23, 2008, this matter was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b), and was assigned to the undersigned Special Superior Court Judge for Complex

Business Cases by Order of the Chief Special Superior Court Judge for Complex Business Cases.  Plaintiff filed the First Amended Complaint on July 9, 2008.  On July 11, 2008, Defendants filed their Answer and Counterclaim.  Plaintiff answered the Counterclaim on July 24, 2008.

{3}    On February 9, 2009, Plaintiff timely filed its Motion for Summary Judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure on the grounds that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the Expert Report and Affidavit of Michael K. Dugan, show that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  Plaintiff's Motion has been determined by the Court without oral argument, which was not requested.

II.

FACTS

A.

BACKGROUND

{4}    On December 11, 1991, Lexington Furniture Industries, Inc. ("Lexington") entered into a Design, Development and License Agreement (the "License Agreement") with The Bob Timberlake Collection, Inc. and Roberts E. Timberlake (collectively "Timberlake").  Under the License Agreement, Timberlake granted Lexington the exclusive right to use its trademarks on or in connection with the manufacture, marketing, promotion, distribution, and sale of certain furniture products.  The License Agreement is set to expire on December 31, 2010.

{5}    On June 11, 2008, Timberlake notified Lexington of its intent to terminate the License Agreement, claiming that Lexington had repeatedly breached Article VII of the agreement.  (D. Timberlake Dep. 90:24–91:14, Dec. 2, 2008, Ex. 7.)  The notice stated that Lexington had "failed for a substantial period of time to use [its] commercially reasonable efforts to promote, advertise, and market the Furniture Products."  (D. Timberlake Dep. 90:24−91:14, Ex. 7.)  The notice further stated that if Lexington did not cure the breaches and compensate Timberlake within sixty

days, the License Agreement would terminate and Lexington's license to use Timberlake's trademarks would come to an end. (D. Timberlake Dep. 90:24–91:14, Ex. 7.)

{6}    In response, Lexington commenced this declaratory judgment action to determine its rights under the License Agreement. Specifically, Lexington seeks a declaration that it has not breached the License Agreement, that the License Agreement remains in full force and effect, and that it is entitled to continue using Timberlake's trademarks. (First Am. Compl. ¶ 17.)

{7}    Timberlake also seeks declaratory judgment. Timberlake's Answer to the Amended Complaint asserts a counterclaim asking the Court to declare its right to terminate the License Agreement based on Lexington's alleged failure to use its commercially reasonable efforts to market the Timberlake Collections. (Answer & Countercl. ¶¶ 2, 6.)

B.

THE LICENSE AGREEMENT

{8}    The License Agreement was originally executed on December 11, 1991, and has been amended several times, most recently in 2005. The January 2005 Amendment provided that the License Agreement would expire on December 31, 2010.

{9}    Under the terms of the License Agreement, Lexington produces, markets, and sells two furniture collections under the Bob Timberlake trademarks: (1) the World of Bob Timberlake and (2) Salt Aire (collectively the "Timberlake Collections"). The Timberlake trademarks have become very well known in the furniture business. According to Daniel Timberlake, Timberlake's Chief Operating Officer and General Counsel, the World of Bob Timberlake has been singled out "as the most successful furniture line in the history of the industry." (D. Timberlake Dep. 22:5–6.) Due to its continued success, Timberlake has collected roughly $25 million in royalties from Lexington sales over the life of the agreement. (D. Timberlake Dep. 124:2–8.)

{10}   In May 2007, Timberlake contacted Lexington about restructuring the terms of the License Agreement.  (D. Timberlake Dep. 74:21–75:5, Ex. 6.) Timberlake also offered to buy out Lexington's interest in the License Agreement. (D. Timberlake Dep. 74:21–75:5, Ex. 6.)  Lexington declined Timberlake's offer.  (D. Timberlake Dep. 74:21–75:5, Ex. 6.)  A couple of weeks later, Timberlake sent Lexington a notice of its intent to terminate the License Agreement.  (D. Timberlake Dep. 90:24–91:14, Ex. 7.)

{11}   At the heart of this litigation is Article VII of the License Agreement. Article VII provides, in part, as follows:

> Promotion. Although the extent to which Lexington will market, distribute, or commercialize the Furniture Products is at the sole discretion of Lexington, subject to limitations relating to manufacturing capacity, materials, shortages, labor dispute, or similar interruptions beyond Lexington's reasonable control, Lexington agrees to use its commercially reasonable efforts in the manufacture, sale, promotion, advertisement, and marketing of Furniture Products to exploit the rights granted herein.  Notwithstanding the preceding sentence, Lexington has no obligation to [Timberlake] to manufacture any particular product or market any specific quantity thereof and Lexington, in its sole discretion, shall determine the commercial life of Furniture Product(s).

(License Agreement Art. VII.)  At his deposition, Daniel Timberlake admitted that Timberlake understood that promotion of the Furniture Products was in the sole discretion of Lexington.  (D. Timberlake Dep. 69:10–15.)

C.

LEXINGTON'S EFFORTS TO MARKET AND PROMOTE THE FURNITURE PRODUCTS

{12}   Timberlake served written discovery on Lexington in which it asked Lexington to identify the efforts it had undertaken to market the Timberlake Collections.  Timberlake also deposed three of Lexington's top executives regarding Lexington's marketing efforts and strategy.  Upon review of the record, the evidence shows that Lexington employs the following strategies to market the Timberlake Collections:

- Lexington utilizes a marketing department that markets all of Lexington's brands, including the Timberlake Collections.

- Lexington designs and maintains a consumer website, catalogs, and point-of-sale materials showcasing the Timberlake Collections.

- Lexington has created and maintains an extranet available to retailers of the Timberlake Collections which includes stock photography, advertising templates, stock video footage, and sales training material.

- Lexington provides funds and/or credits to retailers that advertise Furniture Products in local consumer publications.

- Lexington displays the Timberlake Collections at both the spring and fall High Point Furniture Market each year.

- Lexington provides retailers with an interior design staff to design their own showrooms.

- Lexington maintains an independent commissioned sales force that sells the Timberlake Collections to retailers, interior design firms, hotels, restaurants, and country clubs.

- Lexington has established over 1300 retail outlets for the Timberlake Collections.

- Lexington maintains a large warehouse and distribution center in Lexington, North Carolina, to support sales and to reduce delivery time.

(Pl.'s Ans. Interrog. No. 1.)

D.

TIMBERLAKE'S CRITICISMS OF LEXINGTON'S MARKETING EFFORTS

{13} Lexington served written discovery on Timberlake, which required Timberlake to set forth the basis for its contention that Lexington's marketing efforts have not been commercially reasonable. Timberlake identified the following complaints with respect to Lexington's efforts:

- Lexington failed to place advertisements for the Timberlake Collections in national consumer or trade publications.

- Lexington failed to add additional pieces to the Timberlake Collections when a piece was discontinued.

- Lexington failed to quickly order the Salt Aire Furniture Products after the collection was introduced at the fall 2005 High Point Furniture Market.

- Lexington failed to show the Furniture Products in its showroom at the 2008 Las Vegas Markets.

- Lexington failed to ask Bob Timberlake to conduct personal appearances to promote the Timberlake Collections.

(Defs.' Ans. Interrog. No. 8.)

{14}  In addition to written discovery, Lexington deposed Bob Timberlake and Daniel Timberlake.  Both deponents were asked to specifically articulate the complaints they had regarding Lexington's marketing efforts.  Bob Timberlake was unable to identify any specific complaint he had with Lexington other than to express his disapproval of the character of the executives he had worked with at Lexington since 1999.  (R. Timberlake Dep. 7:3–11:24, Dec. 2, 2008.)  Similarly, Daniel Timberlake was unable to point to any specific complaints.  He generally noted that Lexington "hadn't been doing anything" to market the Timberlake Collections since the 2005 Amendment and that he had been unsatisfied with Lexington's efforts since as early as 2001.  (D. Timberlake Dep. 44:7–46:2, 77:8–22, 89:4–10.)

{15}  In 2004, Lexington approached Timberlake with a written Revitalization Plan for the Timberlake Collections.  (D. Timberlake Dep. 21:8–18.)  Despite its alleged complaints regarding Lexington's marketing strategies, Timberlake did not object to the Revitalization Plan at that time.  (D. Timberlake Dep. 21:8–18.)  Lexington followed through on execution of the Revitalization Plan.  In 2005, Timberlake agreed to an amendment to the License Agreement which extended the parties' business relationship until December 31, 2010.

E.

LEXINGTON'S EVIDENCE OF COMMERCIAL REASONABLNESS

{16}  Following fact discovery, Lexington engaged Michael K. Dugan to act as an expert witness as to whether Lexington's efforts to market the Furniture Products

were commercially reasonable. (Expert Report & Aff. of Michael K. Dugan ¶ 2 [hereinafter "Dugan Aff."].) Mr. Dugan has over sixteen years of experience as the CEO of a furniture company and has worked extensively with the marketing of licensed furniture. (Dugan Aff. ¶ 3.) Currently, Mr. Dugan is a business professor teaching marketing strategy at Lenoir-Rhyne University and a contributing editor to *Home Furnishings Business* magazine. (Dugan Aff. ¶ 4.)

{17} Mr. Dugan filed a lengthy and detailed affidavit specifically addressing each complaint enumerated by Timberlake in discovery. Ultimately, Mr. Dugan concluded that Lexington's efforts "to promote, market, and advertise the Bob Timberlake Furniture Collections have exceeded all industry standards and are more than commercially reasonable." (Dugan Aff. ¶ 2.)

{18} According to Mr. Dugan's affidavit, the decisions Lexington made regarding (1) whether to advertise the Furniture Products in national or trade publications, (2) whether to display the Furniture Products at the 2008 Las Vegas Markets, (3) whether to request personal appearances by Bob Timberlake, (4) whether to discontinue items with a low rate of sale without adding additional pieces to the existing Furniture Products, (5) when to place the initial order for Salt Aire Furniture Products, and (6) how to price the Furniture Products were all consistent with industry standards and were commercially reasonable. (Dugan Aff. ¶¶ 12–26.) Mr. Dugan concluded that Timberlake's criticisms of Lexington, "even if true, do not support the contention that Lexington's efforts have not been commercially reasonable." (Dugan Aff. ¶ 2.)

{19} Mr. Dugan compared Lexington's sales efforts to the sales efforts of the best companies in the industry and concluded: "The overall efforts and materials are equal to that of the best companies in the furniture industry and far stronger than most. Without questions, it exceeds standard industry practice." (Dugan Aff. ¶ 7.)

{20} Timberlake did not designate an expert witness, and it elected not to depose Mr. Dugan. His testimony is unrefuted. Timberlake does not refute what Lexington did; rather it focuses solely on what Lexington did not do.

## III.

## CONTENTIONS OF THE PARTIES

{21} Lexington contends that the uncontroverted evidence shows that Lexington's efforts to promote, advertise, and market the Furniture Products have exceeded industry standards and are more than commercially reasonable. Lexington also contends that under the express terms of the Licensing Agreement, "the extent to which Lexington will market, distribute, or commercialize the Furniture Products is at the sole discretion of Lexington." (License Agreement Art. VII; Pl.'s Mot. Summ. J. ¶ 16.) Based on that language, Lexington argues (1) that the fact that Timberlake disagrees with the marketing efforts Lexington undertook is insufficient to raise a material issue of fact as to whether such efforts were commercially reasonable, and (2) that it is entitled to a judgment as a matter of law.

{22} Conversely, Timberlake contends that Article VII of the License Agreement requires that Lexington use "*its* commercially reasonable efforts" to market the Furniture Products, as opposed to an objective industry standard of commercial reasonableness. (Defs.' Br. Opp'n Mot. Summ. J. at 2.) Timberlake argues that since "its commercially reasonable efforts" is not defined in the License Agreement, the Court must look at the conduct of the parties to determine their intent. Timberlake also asserts that Lexington, in violation of Article VII of the License Agreement, has abandoned its long standing efforts that made the Furniture Products some of the most successful in the industry. Timberlake believes that Mr. Dugan's expert opinions are irrelevant because they relate to an objective industry standard, as opposed to a standard personal to Lexington as Timberlake asserts is required by Article VII.

## IV.

## LEGAL STANDARD

{23} Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled

to judgment as a matter of law." N.C. R. Civ. P. 56(c). "An issue is 'genuine' if it can be proven by substantial evidence and a fact is 'material' if it would constitute or irrevocably establish any material element of a claim or a defense." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citation omitted). "It is not the purpose of the rule to resolve disputed material issues of fact but rather to determine if such issues exist." N.C. R. Civ. P. 56 cmt.

{24} The burden of showing a lack of triable issues of fact falls upon the moving party. *See, e.g.*, *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491, 329 S.E.2d 350, 353 (1985). Once this burden has been met, the nonmoving party must "produce a forecast of evidence demonstrating that [it] will be able to make out at least a prima facie case at trial." *Collingwood v. Gen. Elec. Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). This Court recognizes that it must exercise caution in granting a motion for summary judgment. *See N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303, 310, 230 S.E.2d 375, 379 (1976).

V.

ANALYSIS

{25} In ruling upon the pending motion, the Court must determine whether Lexington breached the License Agreement as a matter of law by failing to use its commercially reasonable efforts to promote, advertise, and market the Furniture Products licensed under the agreement. This determination centers on the meaning of the phrase "its commercially reasonable efforts," as used in Article VII of the License Agreement. That phrase must be read in the full context of the paragraph in which it appears. The parties offer the Court two interpretations.

{26} Timberlake argues that the inclusion of the word "its" prior to the term "commercially reasonable efforts" makes the commercially reasonable standard personal to Lexington. Under this interpretation, Timberlake asks the Court to use Lexington's past practice as the measure of commercial reasonableness for Lexington's present efforts. The Court, however, rejects this interpretation. To require Lexington to market the Timberlake Collections in 2008 in the same

manner as it did when the furniture line was first introduced in 1991 would be unreasonable. The types of promotion and advertising that work effectively for a particular product do not remain static. (Dugan Aff. ¶ 27.) As new collections gain brand name recognition, marketing strategies change to keep in step. (Dugan Aff. ¶ 27.) Moreover, marketing means change daily. The Internet has opened new avenues for advertising—avenues not readily available eighteen years ago. New furniture shows, such as Las Vegas, now exist that were unheard of in 1991. Would Timberlake be satisfied if Lexington restricted its market shows to those which existed in 1991 or if Lexington only used print media that existed when the parties originally executed the contract? If the parties wished to bind Lexington to past practice, then their License Agreement should have expressly stated so.

{27} Lexington, on the other hand, contends that the word "its" simply identifies Lexington as the party responsible for making the commercially reasonable marketing efforts. It argues that Timberlake's interpretation of the phrase "its commercially reasonable efforts" goes beyond the plain language of the License Agreement. According to Lexington, the terms of the agreement unambiguously provide that Lexington's efforts to promote the Timberlake furniture line must be commercially reasonable. Instead of relying on past practice, this interpretation calls for an objective standard based on industry norms. The Court agrees with Lexington's interpretation.

{28} When the plain language of a contract is unambiguous, "it is for the court and not the jury to declare its meaning and effect." *Lowe v. Jackson*, 263 N.C. 634, 636, 140 S.E.2d 1, 2 (1965) (citations omitted). The goal of contract construction is to determine the intention of the parties at the time of execution. *Woods v. Nationwide Mutual Ins. Co.*, 295 N.C. 500, 505, 246 S.E.2d 773, 777 (1978). Courts determine this intention by looking within the "four corners" of the agreement. *Jones v. Palace Realty Co.*, 226 N.C. 303, 305, 37 S.E.2d 906, 907 (1946). If an agreement leaves a term undefined, "non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Woods*, 295 N.C. at 506, 246 S.E.2d at 777. When the ordinary

meaning of a term is subject to "only one reasonable interpretation," the contract must be enforced as written. *Id.* The court may not "rewrite the contract or impose liabilities on the parties not bargained for and found therein." *Id.* Therefore, absent an express provision to the contrary, this Court will not measure Lexington's marketing efforts against an inflexible standard of past practice that is not even spelled out in the agreement.

{29} In determining "commercial reasonableness," courts should not engage in a selective process identifying whether any specific activity should or should not have been used. Rather, the test is the marketing effort as a whole which must be measured against some industry standard. Courts lack the expertise to "blue pencil" marketing plans. Such an activity would amount to unauthorized rewriting of the contract the parties voluntarily executed. *See Avesair, Inc. v. InPhonic, Inc.*, 2007 NCBC 32 ¶ 36 (N.C. Super. Ct. Oct. 16, 2007), http://www.ncbusinesscourt.net/opinions/101607%20Order%20Webpage.pdf.

{30} The Court finds that the License Agreement is unambiguous in the sense that it does not obligate Lexington to use the same marketing strategies it historically used to promote the Timberlake Collections. Including the word "its" does not bind Lexington to past practice. If anything, including the word "its" suggests a measure of commercial reasonableness given Lexington's size and circumstances. Other provisions of the License Agreement lend further support to the Court's interpretation. For example, Article VII gives Lexington sole discretion over "the extent to which [it] will market, distribute, or commercialize the Furniture Products." (License Agreement Art. VII.) Such a broad grant of discretion would necessarily include decisions concerning personal appearances, national advertising, and the introduction of new products. Where fair minds might differ over the "best" marketing strategy for the Timberlake Collections, under the discretionary provision of Article VII, Lexington's decision on what is "best" prevails.

{31} The License Agreement should be interpreted as a whole, "considering each clause and word with reference to other provisions and giving effect to each if

possible by any reasonable construction." *State v. Corl*, 58 N.C. App. 107, 111, 293 S.E.2d 264, 267 (1982) (citation omitted). Timberlake's interpretation, however, would render the discretionary language in Article VII useless or even contradictory. When possible, contractual terms "are to be harmoniously construed." *Reaves v. Hayes*, 174 N.C. App. 341, 345, 620 S.E.2d 726, 729 (2005) (citation omitted). The Court, therefore, rejects any interpretation that limits Lexington's discretion to past practice.

{32} Although Timberlake identifies several areas where Lexington's marketing efforts were allegedly deficient, it offers no evidence that these purported deficiencies violated any industry standard or custom. The mere fact that Timberlake disagrees with the marketing decisions Lexington made is not enough to raise an issue of fact as to whether such decisions were commercially reasonable. *See Duff v. McGraw-Hill Cos.*, No. C02-1347RSL, 2006 U.S. Dist. LEXIS 57117, at *13–14 (W.D. Wash. July 28, 2006). To raise an issue of commercial reasonableness, a party must first introduce evidence as to the applicable industry standard. *See Auto-Chlor Sys. of Minn., Inc. v. JohnsonDiversey*, 328 F. Supp. 2d 980, 1006–07 (D. Minn. 2004). This showing generally requires specialized knowledge in the form of expert testimony. *Reliance Ins. Co. v. Keybank U.S.A.*, No. 1:01 CV 62, 2006 U.S. Dist. LEXIS 70823, at *107–08 (N.D. Ohio Sept. 29, 2006). Timberlake, though, failed to present any evidence of industry standards.

{33} Only Lexington came forward with evidence of industry standards—the Expert Report and Affidavit of Michael K. Dugan. This evidence shows that Lexington's efforts to market, promote, and advertise the Timberlake Collections "have exceeded all industry standards." (Dugan Aff. ¶¶ 2, 7–11.) According to Mr. Dugan, Lexington's overall efforts "are equal to that of the best companies in the furniture industry and far stronger than most." (Dugan Aff. ¶ 7.) Moreover, Lexington's expert addressed each of Timberlake's criticisms in turn and refuted each one with evidence of industry standards:

- National consumer and trade publications advertise to one's competitors and thus would have achieved little effect; therefore, Lexington's decision to advertise in local consumer publications was strategic.
- Discontinuing pieces in a furniture collection with a low rate of sale is common within the industry; however, adding new pieces to an existing furniture collection rarely triggers a boost in sales.
- Lexington's delay in ordering Salt Aire Furniture Products after the fall 2005 High Point Furniture Market was necessary to ascertain the rates of sale for each piece in the collection and to avoid the manufacturing costs of pieces that did not sell—a sensible strategy in line with standard industry practice.
- Lexington's decision to feature only new furniture collections at the 2008 Las Vegas Markets was also in line with standard industry practice because retailers attend the markets to find out what *new* collections are being introduced.
- Scheduling personal appearances by Bob Timberlake would have had little effect on sales and was a decision solely within Lexington's discretion.

(Dugan Aff. ¶¶ 13–25.)

{34} Timberlake has offered no evidence of an industry standard to contradict Lexington's expert. With no evidence to the contrary, the Court finds that Timberlake has failed to raise a genuine issue of material fact. The evidence before the Court establishes that Lexington's marketing efforts were commercially reasonable within the furniture industry for a company of its size and that Lexington is entitled to judgment as a matter of law. If Timberlake disagreed with Lexington's overall marketing strategy, it could have renegotiated the terms in 2005 when the parties amended the License Agreement. Instead, Timberlake agreed to extend the License Agreement until 2010.

## VI.
### CONCLUSION

{35} Based on the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED:

1) Plaintiff's Motion for Summary Judgment is GRANTED;

2) Plaintiff's efforts to promote, advertise, and market the Timberlake Collections have been commercially reasonable;

3) The License Agreement remains in full force and effect;

4) Plaintiff is entitled to all of the rights bestowed upon it by the License Agreement; and

5) Defendants' Counterclaim is dismissed with prejudice.

IT IS SO ORDERED, this the 9th day of September, 2009.